IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

B.C. LOGISTICS, L.L.C.,                    *

      Plaintiff,                              *

v.                                          *         Civil Action No.: RDB 06-199

ICAT AGENCY, INC., *et al.*,                 *

      Defendants.                            *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

This action arose out of a contract between B.C. Logistics, L.L.C. ("B.C." or "Plaintiff") and ICAT Agency, Inc. ("ICAT Agency") pursuant to which B.C. provided numerous logistical services for ICAT Agency, an affiliate of ICAT Logistics, Inc. ("ICAT Logistics"), a provider of worldwide freight services and transport logistics.  B.C. claims that both ICAT Agency and ICAT Logistics ("Defendants") breached the contract and that ICAT Logistics intentionally interfered with B.C.'s business relations.  ICAT Agency filed a counterclaim against B.C., alleging that B.C. breached the contract and interfered with its prospective business relations. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Pending before this Court is B.C.'s Partial Motion for Summary Judgment as to Count I of the Complaint and both counts of the Counterclaim.  The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2004).  For the reasons that follow, B.C.'s Motion for Partial Summary Judgment is DENIED.

## BACKGROUND AND PROCEDURAL HISTORY

The facts are viewed in a light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  ICAT Logistics,

Inc. is a Maryland corporation located in Linthicum, Maryland, that offers "worldwide transport logistics and expedited freight services with locations in 19 states and associate agencies in 75 countries." (Compl. ¶ 5.) ICAT Agency, Inc., a separate Maryland corporation, apparently holds the intellectual property rights to ICAT Logistics, Inc.'s name and is an affiliate of that corporation.[1]

On May 29, 2001, B.C. Logistics, L.L.C., based in Tempe, Arizona, entered into a Freight Sales and Operating Agreement ("the Agreement") with ICAT Agency. (Pl.'s Mem. Supp. Summ. J. Ex. A [hereinafter "Agreement"].) Pursuant to the Agreement, B.C. provided a variety of services for ICAT Agency, including soliciting inbound and outbound airfreight, preparing air waybills and other related documents, entering data from air waybills into ICAT Agency's computer system, and numerous other "logistical" services. (*Id.* § 3.) B.C. was responsible for performing these services in a specific "territory," namely Maricopa County, Arizona, which includes the metropolitan Phoenix area. (*Id.* § 3.1 & Appx. 1.) However, B.C. was permitted to solicit business in other territories as long as it "communicate[d] such activities to ICAT [Agency]." (*Id.* at Appx. 1.)

Pursuant to section 3.5 of the Agreement, B.C. operated a place of business within the Arizona territory. When answering telephones, B.C. employees were supposed to "identify the place of business as ICAT Logistics, Inc." (*Id.* § 3.6.) However, the Agreement expressly provided that ICAT Agency "holds all right, title and interest in and to . . . the business name 'I.C.A.T. Logistics, Inc.' and any variation thereof" and that B.C. was never to enter into any

---

[1] The exact relationship between ICAT Agency and ICAT Logistics is unclear from the record.

contracts in the name of ICAT Logistics.  (*Id*. §§ 9.1, 9.4.)  The Agreement also prohibited B.C. from representing any person or entity involved in the freight trade besides ICAT Agency for the duration of the contract.  (*Id*. § 10.)

The Agreement was to be in effect for five years and renew each year thereafter if neither party objected.  (*Id*. § 1.)  ICAT Agency had the right to terminate the contract during the first 120 days without cause, or anytime thereafter upon "ninety (90) days prior written notice to [B.C.]" (*Id*. § 1.2.)  It could also "immediately" terminate the Agreement if B.C. "(i) fail[ed] to perform its obligations . . . (ii) fail[ed] to remit to ICAT when due any sum of money required to be remitted . . . or (iii) breache[d] any of the other terms, conditions or covenants herein and fail[ed] to cure such breach within thirty (30) days following written notice thereof from ICAT." (*Id*. § 1.1.)

The Defendants contend in their Counterclaim that the president and owner of B.C., Vicki Boisjolie ("Boisjolie"), occasionally behaved unprofessionally to both customers and employees of the ICAT companies.  (Rivas Dep. 24:4-6, 25:18-26:3, 27:13-29:16, 36:15-23; 37:5-7.)  On one occasion, Boisjolie admitted that she called an ICAT employee "dense." (Boisjolie Dep. 205:21-207:3.)  Also, in May of 2002 when Boisjolie contacted Dave Lucia ("Lucia"), President of Security Cargo Network, Inc., a potential client, she falsely reported that "ICAT lacked international shipping experience," complained that her company "paid ICAT Logistics, Inc. too much money," and addressed Lucia in an "aggressive and somewhat hostile" manner.  (Lucia Aff. ¶¶ 3, 4, 6, 8.)  Lucia reported the conversation to Rick Campbell ("Campbell"), President of ICAT Logistics.

On May 6, 2002, Campbell sent a Formal Notice of Contract Breach ("Notice of

Breach") to Boisjolie.  (Pl.'s Mem. Supp. Summ. J. Ex. C.)  The Notice of Breach identified two

areas where B.C. had breached the Agreement.  First, ICAT Logistics alleged that B.C.

employees exhibited a lack of professionalism when dealing with ICAT personnel.  (*Id.*)

Boisjolie was specifically named, and the letter said that ICAT Logistics would not tolerate

"'personal attacks', rude comments or behavior, inappropriate comments, or untruths of any

kind."  (*Id.*)  The second issue was that B.C. employees were sharing concerns and confidential

information with outside parties, including other ICAT agencies.  (*Id.*)  The letter stated that all

such communications should only be made in writing to ICAT Logistics' corporate address and

should not be discussed with third parties.  (*Id.*)  The letter informed B.C. that it had thirty days

to cure the problems, and specifically asked B.C. to submit a written plan as to how it would

come into compliance.  (*Id.*)  In response, B.C. established a series of procedures to address

Campbell's concerns.  (*See* Defs.' Opp'n Summ. J. Ex. E.)  After this, "[t]he matter appeared

settled at the time, and there was no mention of the alleged breach for over three years."  (Pl.'s

Mem. Supp. Summ. J. 9.)

From 2002 to 2005, B.C. solicited business and arranged shipments that originated

outside of its Arizona territory, in states such as California, Georgia, Illinois, and Nevada.

(Defs.' Opp'n Summ. J. Ex. D.)  B.C. also conducted cartage services for its clients, although the

parties dispute whether it properly split the profit with ICAT Agency.  (*See* Boisjolie Dep.

279:13-17; Defs.' Opp'n Summ. J. 15.)

Beginning in 2002, B.C. moved freight for a company called Heraeus.  (Boisjolie Aff. ¶

11.)  By 2005, Heraeus provided the majority of B.C.'s business.  Heraeus invited B.C. to place

an advertisement in the September 2005 issue of a trade magazine accompanying an article on

4

Heraeus.  (*Id.* ¶ 13.)  B.C. accepted the offer and placed an ad entitled "Congratulations to ICAT

Phoenix" in the magazine.  (*See* Defs.' Opp'n Summ. J. Ex. J.)  The ad depicted the ICAT

Logistics name and logo, stated that "ICAT Phoenix Agency" was "certified" as a Women

Owned Business, Small Business Enterprise, and Disadvantaged Business Enterprise, and gave

B.C.'s phone number.  (*Id.*)  The parties dispute whether B.C. obtained permission to run the ad.

(*See* Boisjolie Aff. ¶ 14; Pl.'s Mem. Supp. Summ. J. Ex. F; Defs.' Opp'n Summ. J. 15.)

 In November of 2005, Boisjolie allegedly requested that a shipment entry be removed

from the ICAT system grid.[2]  (Defs.' Opp'n Summ. J. Ex. I; Perkins Aff. ¶ 4.)  She disputes this

allegation.  (Boisjolie Dep. 293:15-21.)

 On December 2, 2005, ICAT Logistics's Chief Financial Officer, Richard Pototsky hand-

delivered a termination of contract letter to B.C. giving ninety days prior written notice pursuant

to section 1.2 of the Agreement.  (Pl.'s Mem. Supp. Summ. J. Ex. K.)  Because of suspicions that

B.C. was "running freight outside of [ICAT's] system," Pototsky attempted to back up B.C.'s

hard drive, but was unsuccessful.  (Pototsky Dep. 38:3-15.)  Boisjolie cooperated with this

request and additionally allowed Pototsky to look through her books and records.  (*Id.* at 38:9-

16.)  Shortly after Pototsky left, while Boisjolie was on her way to the bank to check B.C.'s

financial status, she received a phone call from a B.C. employee informing her that the office's

---

 [2] As Plaintiff aptly notes, the information contained in Jeanie Perkins' affidavit is
inadmissible hearsay, because Perkins did not herself hear Boisjolie reverse the shipment order.
Instead, Perkins's affidavit merely recalls a statement made by Carol Higgins, an ICAT
employee, regarding *Higgins's* conversation with Boisjolie.  (Pl.'s Reply 4-5.)  Plaintiff
additionally argues that, even if Boisjolie reversed the shipment, that action would not fall under
either section 1.1(i) or 1.1(ii), so ICAT Agency would have had to provide thirty days notice
pursuant to section 1.1(iii).  (*See* Pl.'s Reply 5.)  While 1.1(ii) is clearly inapplicable, the trier of
fact must determine whether reversing a shipment order would constitute B.C.'s "fail[ure] to
perform its obligations" under section 1.1(i).

fax machine and email system had been shut down.  (Boisjolie Dep. 130:17-21.)

Later that day, Campbell learned that B.C. had solicited business and shipped freight outside of its Arizona territory, that Boisjolie had allegedly requested that a shipment entry be reversed off of the ICAT system grid, and that she had published the advertisement in the trade magazine without his approval.  (Defs.' Opp'n Summ. J. 2.)  After these discoveries, counsel for ICAT Logistics, Thomas McVey, faxed a notice to Boisjolie at her home on December 2, 2005, purporting to immediately terminate the Agreement pursuant to section 1.1.  (Pl.'s Mem. Supp. Summ. J. Ex. S; Boisjolie Dep. 136:14-17.)  The letter cited specific actions taken by B.C. that violated the Agreement: arranging shipping transactions that "were not processed through ICAT" in violation of sections 5.2 and 10; arranging shipments in other ICAT territories without notice to ICAT Agency in violation of Appendix 1; soliciting and hiring an ICAT employee in violation of section 16; advertising in a national publication and operating a trade show booth in violation of section 9.4; and attempting "to engage a national account customer" in B.C.'s own name.  (*Id.*)

Within a week after B.C.'s termination, Campbell asked Daniel Cser ("Cser"), owner of the ICAT agency in Detroit, to travel to Phoenix "to attempt to service the[] customers" there. (Cser Dep. 33:8-12.)  Cser made three trips to Phoenix and his Detroit company "ended up servicing in Maricopa County" for a period of time, including the lucrative Heraeus account. (*Id.* at 34:5-18, 38:14-16.)

It is undisputed that B.C. has not been paid certain "commissions and reserve funds" although the parties dispute what amount B.C. is owed, if any.  (Defs.' Opp'n Summ. J. 10.)  In addition, on December 8, 2005, ICAT Logistics reversed a payment of more than $18,000 that it

had made to B.C. the day before.  (Pl.'s Mem. Supp. Summ. J. Ex. Y.)

On January 23, 2006, B.C. Logistics, L.L.C. filed a three-count Complaint against ICAT Agency, Inc. and ICAT Logistics, Inc.  Count I alleges that ICAT Agency and ICAT Logistics breached the contract, while Counts II and III allege that ICAT Logistics intentionally interfered with B.C.'s business relations.  On February 21, 2006, ICAT Agency filed a two-count Counterclaim against B.C., alleging that B.C. breached the contract and tortiously interfered with ICAT Agency's prospective business relations.  (Paper No. 4.)  On August 25, 2006, ICAT Agency filed an amended counterclaim (Paper No. 21), but later withdrew it, thereby reinstating the original Counterclaim.  On December 6, 2006, B.C. filed the subject Motion for Partial Summary Judgment (Paper No. 30) seeking summary judgment as to Count I of the Complaint and both counts of the Counterclaim.

<u>STANDARD OF REVIEW</u>

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  *Nat'l City Bank of Indiana v. Turnbaugh*, 463 F.3d 325, 329 (4th Cir. 2006).  In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  477 U.S. 242, 249 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict

for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). However, the opponent must bring forth evidence upon which a reasonable fact finder could rely. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). "Once the movant has established the absence of any genuine issue of material fact, the opposing party has an obligation to present some type of evidence to the court demonstrating the existence of an issue of fact." *Pension Ben. Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005) (citing *Pine Ridge Coal Co. v. Local 8377, UMW,* 187 F.3d 415, 422 (4th Cir. 1999)).

## ANALYSIS

Plaintiff B.C. Logistics, L.L.C. has moved for partial summary judgment as to Count I of its Complaint and as to both counts of the Counterclaim against it. As this Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332, the substantive law of the State of Maryland applies. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Thus, this Court must apply Maryland law to B.C.'s breach of contract claim, as set forth in the Complaint, and to ICAT Agency's breach of contract and tortious interference with prospective business relations claims, as set forth in the Counterclaim.[3]

---

[3] Under Maryland's choice of law rules, the State "favor[s] the enforcement of choice of law provisions in contracts." *Tomran, Inc. v. Passano*, 891 A.2d 336, 351 n.2 (Md. 2006) (citing *Kronovet v. Lipchin*, 415 A.2d 1096, 1104 (Md. 1980). Under section 18 of the Agreement, Maryland substantive law governs all claims "arising out of or relating to" the Agreement.

## I.     Count I of the Complaint: Defendants' Breach of Contract

In its Complaint, B.C. contends that ICAT Logistics, Inc. and ICAT Agency, Inc.

breached the Agreement.  An initial matter raised by ICAT Logistics is that it was not named in

the Agreement as a party and therefore cannot be liable for breach of contract.  (Defs.' Opp'n

Summ. J. 10.)  The Agreement expressly names only B.C. and ICAT Agency.  (Agreement at 1.)

In addition, Vicki Boisjolie, owner of B.C., conceded in her affidavit that the contract was

between her company and ICAT Agency.  (Boisjolie Aff. ¶ 2.)  Thus, it is clear that ICAT

Logistics, although involved in the events leading to this lawsuit, was not a party to the contract

and therefore cannot be held liable for breaching it.  *See Sibley v. Lutheran Hosp. of Md., Inc.*,

871 F.2d 479, 487 (4th Cir. 1989) (holding that an individual acting like an agent of a hospital

could not be personally liable where the contract was between the patient and hospital only);

*Ritz-Craft Corp. v. Stanford Mgmt. Group*, 800 F. Supp. 1312, 1314 (D. Md. 1992).

Accordingly, Plaintiff's Motion for Partial Summary Judgment is DENIED as to ICAT

Logistics, Inc. with respect to Count I of the Complaint.

As to the remaining Defendant, B.C. contends that ICAT Agency breached the

Agreement in two ways: by immediately terminating the contract on December 2, 2005, without

giving B.C. thirty days to cure the problem, and by withholding funds from B.C.

### A.     Immediate Termination of Contract

First, B.C. alleges that ICAT Agency breached the contract by sending a notice of

immediate termination without giving B.C. thirty days to cure the alleged breaches.  Section 1.1

of the Agreement provides that ICAT Agency could "immediately" terminate the Agreement if

B.C. "(i) fail[ed] to perform its obligations . . . (ii) fail[ed] to remit to ICAT when due any sum

of money required to be remitted . . . or (iii) breache[d] any of the other terms, conditions or covenants herein and fail[ed] to cure such breach within thirty (30) days following written notice thereof from ICAT." (Agreement § 1.1.)  The parties dispute whether the thirty-day cure period was a requirement of all three subsections of section 1.1 or just a requirement of subsection (iii); B.C. argues that the thirty-day period applies in any of the three circumstances, while ICAT Agency contends it applies only to (iii).  (*See* Pl.'s Mem. Supp. Summ. J. 5 n.1 & 22-23; Defs.' Opp'n Summ. J. 13.)  "Under Maryland law, 'the interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law.'" *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005) (quoting *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 544 (Md. 2003)). "An ambiguity arises when the language of the contract is susceptible of more than one meaning to a reasonably prudent person." *Auction & Estate Representatives, Inc. v. Ashton*, 731 A.2d 441, 444-45 (Md. 1999). Both parties in this case agree that "[o]nly an unambiguous writing justifies summary judgment without resort to extrinsic evidence. . . .'" *World-Wide Rights Ltd. P'ship v. Combe, Inc*., 955 F.2d 242, 245 (4th Cir. 1992).   In this case, the applicability of the thirty-day notice and cure provision to just one or all three categories of breaches in section 1.1 of the Agreement could be subject to two different, but reasonable, interpretations and is, therefore, ambiguous.  Thus, "the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract." *Sy-Lene of Wash., Inc.,* 829 A.2d at 547 (citation and internal quotation marks omitted).  As neither party has submitted additional evidence as to its own interpretation, this Court must interpret the provision based on the language and structure of the contract.

The three categories of scenarios in which ICAT Agency can immediately terminate the Agreement are divided into subsections (i), (ii), and (iii).  (Agreement § 1.1.)  The first two categories are the failure to perform obligations and the failure to remit money.  (*Id*.)  The fact that these two categories are singled out indicates that they are the most important to ICAT Agency or perhaps the most egregious.   In contrast, the third category refers generally to "breach[ing] any of the other terms, conditions or covenants herein."  (*Id*.)  The thirty-day cure period phrase expressly refers to failing to cure "such breach" suggesting a direct reference to the "breach[]" mentioned in subsection (iii).  (*Id*.)  The juxtaposition of the two phrases after the "(iii)"—without separation by a comma—most clearly means that the thirty-day cure period applies only to that third category of general breaches, not the first two.  In addition, if the parties intended for the thirty-day cure period to apply to all three categories, they could have easily placed the thirty-day cure requirement in the beginning of section 1.1 or in a separate sentence indicating that it was to be applied to (i), (ii), *and* (iii).  Accordingly, this Court finds that the thirty-day cure period phrase applies only to (iii).

In its submissions to the Court, B.C. contends that ICAT Agency breached the contract even under the interpretation this Court has adopted.  (Pl.'s Mem. Supp. Summ. J. 22-23.)  On December 2, 2005, counsel for ICAT Logistics faxed a letter to B.C. purporting to immediately terminate the Agreement pursuant to section 1.1.  (Pl.'s Mem. Supp. Summ. J. Ex. S.)  The letter explained that B.C. violated the Agreement by arranging shipping transactions that "were not processed through ICAT" in violation of sections 5.2 and 10, arranging shipments in other ICAT territories without notice to ICAT Agency in violation of Appendix 1, soliciting and hiring an ICAT employee in violation of section 16, advertising in a national publication and operating a

trade show booth in violation of section 9.4, and attempting "to engage a national account customer" in B.C.'s own name.  (*Id.*)  ICAT Agency contends that these actions taken by B.C. enabled it to immediately terminate the Agreement.  B.C. not only disputes these allegations, but also contends that its conduct did not fall under any of the three categories warranting immediate termination under section 1.1.  (Pl.'s Mem. Supp. Summ . J. 22-23.)  In addition, because it claims that it never "fail[ed] to perform its obligations" and always "remit[ted] to ICAT" all monies due, B.C. contends that even under ICAT Agency's narrower interpretation, it should have had thirty days under section 1.1(iii) to cure the alleged breaches.  (*Id.* at 23.)

There are clearly genuine issues of fact as to whether B.C.'s alleged actions fell into any of the three categories of breaches in section 1.1 that would permit ICAT Agency to immediately terminate the Agreement, with or without thirty days to cure.  For example, the parties dispute whether the shipments originating outside B.C.'s territory violated the Agreement.[4]  In addition, there is an issue of fact as to whether Boisjolie had permission to run the magazine advertisement, albeit not from Campbell himself.  Finally, it is unclear whether B.C. performed cartage services under its own name without splitting the profit with ICAT Agency.  Because ICAT Agency has presented sufficient evidence to create these and other genuine issues of material fact regarding B.C.'s alleged breaches, this Court cannot find as a matter of law that ICAT Agency breached the Agreement by immediately terminating it.

**B.     Withheld Funds**

B.C. contends that ICAT Agency breached the Agreement by withholding commissions

---

[4]  For example, B.C. notes that at least one of its employees brought with her to the company some existing clients in Denver and Las Vegas, for whom B.C. continued to provide services.  (Boisjolie Dep. 105:14-22, 107:5-108:5.)

that it had earned prior to the termination of the Agreement and by reversing a payment of more

than $18,000 that ICAT Logistics had previously made to B.C.  Pursuant to section 6.1.1 of the

Agreement, ICAT Agency was to pay to B.C. a commission for "each item of business procured

by [B.C.] not later than the third Thursday following the calendar week in which ICAT issues the

invoice for such items of business."  (Agreement § 6.1.1.)  ICAT Agency concedes that "the

commissions and reserve funds have not been paid to Plaintiff" but it argues that the amount

owed, if any, is in dispute and depends on whether B.C. breached the Agreement first, thereby

entitling ICAT Agency to a setoff.  (Defs.' Opp'n Summ. J. 10.)  It advances two theories why it

appropriately withheld the money.

First, ICAT Agency aptly notes, "Maryland law follows the principle that a material

breach of an agreement by one party excuses the subsequent performance by another party."

(Defs.' Opp'n Summ. J. 11 (citing *K&G Constr. Co. v. Harris*, 164 A.2d 451 (Md. 1960).)  In

*K&G Construction Co.,* the Maryland Court of Appeals held that a contractor's failure to

perform his contractual obligations may justify the owner in refusing to make payments.  *Id.* at

456.  In this case, ICAT Agency argues, if B.C. breached the Agreement, ICAT Agency was

justified in withholding the commissions and other funds.  B.C. contends that even if it had

breached the contract as alleged, its actions "would not amount to material breaches" that would

permit ICAT Agency to cease its performance, *i.e.*, to withhold payments.  (Pl.'s Reply 9.)

However, whether each of the alleged breaches is "material" is an issue of fact for the jury to

decide.

In the alternative, ICAT Agency argues that it is entitled to the withheld money as

damages for B.C.'s alleged breaches, pursuant to its right of setoff.  *See USEMCO, Inc. v.*

*Marbro Co., Inc*. 483 A.2d 88 (Md. 1984).  Setoff "means a diminution or a complete counterbalancing of the adversary's claim based upon circumstances arising out of a transaction other than that on which the adversary's claim is based. . . ."  *Imbesi v. Carpenter Realty Corp*., 744 A.2d 549, 552 (Md. 2000).  "The right of setoff may arise contractually or under state law. . . ."  *Citizens Bank v. Strumpf (In re Strumpf)*, 37 F.3d 155, 157 (4th Cir. 1994).  Although ICAT Agency has not yet cited any contractual or statutory authority for its right of setoff, the issue could not even be resolved until the finder of fact determines the extent to which B.C. breached the Agreement, if at all.

Under both of ICAT Agency's alternative theories, the issue of withheld funds cannot be resolved until a determination is made as to B.C.'s liability for breach of contract.  Thus, there is a genuine issue of fact as to what amount, if any, ICAT is withholding from B.C. in violation of the Agreement.

In conclusion, there are many genuine issues of material fact that must be addressed by the trier of fact as to B.C.'s breach of contract claim in Count I of the Complaint.  Accordingly, B.C.'s Motion for Partial Summary Judgment is DENIED as to Count I of the Complaint.

**II.      Count I of the Counterclaim: B.C. Logistics, L.L.C.'s Breach of Contract**

ICAT Agency claims that B.C. breached three different provisions in the Agreement. (Counterclaim ¶¶ 6-8.)  First, ICAT Agency alleges that B.C. breached sections 5.2 and 10 of the Agreement by "soliciting numerous customers for transportation services and invoicing such customer's in [B.C.'s] name or in the name of another transportation provider rather than in ICAT Agency's name, thereby usurping ICAT Agency's business relations and associated profit."  (*Id.* ¶ 6.)  Second, ICAT Agency alleges that B.C. breached Appendix I by soliciting

business outside its territory without ICAT Agency's approval.  (*Id.* ¶ 7.)  Third, ICAT Agency

alleges that B.C. breached section 9 of the Agreement by "distributing promotional and

advertising materials in the name of ICAT Agency and/or ICAT Logistics, Inc." where the

materials list B.C.'s telephone number.  (*Id.* ¶ 8.)

As noted *supra* in Part I, there are several genuine issues of material fact as to whether

B.C. breached these provisions of Agreement, especially because B.C. denies all of the

allegations in the immediate termination notice of December 2, 2005.[5]  Accordingly, B.C.'s

Motion for Summary Judgment is DENIED as to Count I of the Counterclaim.

### III.    Count II of the Counterclaim: Interference with Prospective Business Relations

ICAT Agency also alleges that B.C. tortiously interfered with its business relations.  It is

well established that "Maryland recognizes the tort action for wrongful interference with

contractual or business relationships in two general forms: 'inducing the breach of an existing

contract and, more broadly, maliciously or wrongfully interfering with economic relationships. .

. .'" *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.*, 650 A.2d 260, 268 (Md. 1994)

(citing *Natural Design, Inc. v. Rouse Co.*, 485 A.2d 663, 674 (1984)).  To win a claim for

tortious interference with business relations, a plaintiff must show: "(1) intentional and willful

acts; (2) calculated to cause damage to the plaintiff[] in [its] lawful business; (3) done with the

unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of

the defendants; and (4) actual damage and loss resulting." *Berlyn, Inc. v. Gazette Newspapers*,

_____

[5]  It is important to note that, although the immediate termination notice alleged
violations of section 16 of the Agreement (*see* Defs.' Opp'n Summ. J. Ex. Q), the Counterclaim
contains no reference to that provision.  Apparently, ICAT Agency no longer contends that B.C.
violated section 16 of the Agreement.

223 F. Supp. 2d 718, 741 (D. Md. 2002) (citing *Alexander & Alexander, Inc.*, 650 A.2d at 268-69.)

In this case, ICAT Agency alleges that B.C. interfered with its business by "soliciting numerous customers for transportation services and invoicing such customers in [B.C.'s] name or in the name of another transportation provider rather than in ICAT Agency's name, thereby usurping ICAT Agency's business relations and associated profit." (Counterclaim ¶ 6.)  In addition, ICAT Agency alleges that B.C.'s distribution of promotional materials using the ICAT name but including B.C.'s phone number resulted in lost business opportunities. (*Id.* ¶ 8.)  ICAT Agency notes that the same acts that support its breach of contract against B.C. also support its claim for tortious interference with prospective business relations. (Defs.' Opp'n Summ. J. 18.)  Thus, it argues, because there are genuine issues of material facts as to those acts, B.C. is not entitled to summary judgment as a matter of law. (*Id.*)

It is undisputed that B.C.'s magazine advertisement contained the ICAT Logistics name and logo. (*Id.* at Ex. J.)  It is also undisputed that B.C. submitted a proposal to one company that included a copy of its City of Phoenix certification as a women owned business under the name B.C. Logistics L.L.C. d/b/a ICAT Logistics. (*Id.* at Ex. L.)  Whether these and other actions were "intentional and willful" and "calculated to cause damage to [ICAT Agency]" are questions for the trier of fact.  On the element of damages, B.C. points out that the president of ICAT Logistics was unable to determine the full scope of damages it suffered. (*See* Campbell Dep., Vol. II, 350:17-351:4.)  The only damages mentioned were loss of business from not having B.C. as an ICAT agent anymore. (*Id.* at 351:6-7.)  However, since ICAT Agency could recover nominal damages, with a jury instruction, it is not essential for it to prove exact damages at this

time.  *See Bugg v. Brown*, 246 A.2d 235, 239 (Md. 1968) (quoting *Mason v. Wrightson*, 109

A.2d 128 (Md. 1954)); *Horn v. Seth*, 95 A.2d 312, 316 (Md. 1953).

Accordingly, because there are genuine issues of material fact as to ICAT Agency's

tortious interference with prospective business relations claim, B.C.'s Motion for Partial

Summary Judgment is DENIED with respect to Count II of the Counterclaim.

<u>CONCLUSION</u>

For the foregoing reasons, B.C. Logistics, Inc.'s Motion for Partial Summary Judgment is

DENIED.  This case will proceed to trial on all claims and counterclaims.  A separate Order

follows.

/s/
Richard D. Bennett
Date: August 16, 2007                    United States District Judge

17